IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

RANDY POTTS,

        Plaintiff,

v.                                                            Case No. 2:16-cv-02264-JTM

SAINT LUKE'S SOUTH HOSPITAL, INC.,

        Defendant.

**MEMORANDUM AND ORDER**

Plaintiff Randy Potts worked as a housekeeper at Saint Luke's South Hospital ("SLS") from 2004 until September 22, 2014, when SLS terminated his employment. The termination came after plaintiff had a heated argument with a supervisor. Plaintiff filed this suit claiming that SLS discriminated against him on account of race in violation of Title VII of the Civil Rights Act of 1964. The matter is now before the court on SLS's motion for summary judgment. For the reasons set forth herein, defendant's motion is granted.

**I. Uncontroverted Facts.**

Plaintiff is an African-American male. SLS hired him on June 21, 2004, as a housekeeper, the position he had until his termination. Plaintiff was responsible for cleaning patient rooms, floors, and general cleaning in public areas. He worked the evening shift for most of his tenure, including at his termination.

Housekeepers at SLS work in the Environmental Services Department ("EVS"). Beginning in July 2014 the Manager of EVS was Dwight Hawkins, who reported to

System Director of Hospitality John McReynolds. All housekeepers reported directly to Hawkins.

EVS had supervisors on both the day and evening shifts. Michael Geraldi, who is Caucasian, moved from daytime supervisor to evening supervisor shortly before plaintiff's termination. Plaintiff thought Geraldi was mean; he called Geraldi "the drill sergeant." Geraldi was a former military person who, according to plaintiff, spoke to people in a very demanding way, "like 'you better or else.'" Geraldi would sometimes yell down the hallway at employees things such as, "Get back to work, what are you doing in this area." He frequently asked employees, "What are you doing, where are you going?" Plaintiff testified Geraldi sometimes told him to "get your ass back to work" and said plaintiff "had one foot out the door." Plaintiff felt Geraldi picked on him and was always asking him "What are you doing?"

Plaintiff contends Geraldi had a racial animus, as shown by: on one occasion, Geraldi allegedly said he did not like fat women and "especially fat black women;" on approximately seven occasions Geraldi said, "Potts, you've got one foot out the door;" on five occasions Geraldi said to plaintiff "You better watch your back;" and on three occasions Geraldi said to plaintiff "Get your ass back to work." Geraldi would pick up a rag and wave it in plaintiff's face, asking "What's this?" When plaintiff said it was a rag, Geraldi would ask what it was used for. When plaintiff would respond, "for cleaning," Geraldi would say, "Well, how come you're not using it?"

One day Geraldi saw plaintiff and another employee talking in the hallway and asked "What are you doing?" Plaintiff said he was talking. Geraldi said, "You don't

need to be talking, you need to be working." When plaintiff left, Geraldi told the other employee "don't ever talk to him again."

Before September 16, 2014, plaintiff never told SLS of any of the alleged comments of Geraldi and never complained to SLS about him. Plaintiff was aware of his obligation under SLS's policies to report any harassment or discrimination.

The last Friday that plaintiff worked, Geraldi saw plaintiff in a hallway and asked him what he was doing. Plaintiff said he was walking to where he needed to go to work. After plaintiff went down to his area Geraldi showed up and "was on me all day for no apparent reason." Every time plaintiff "didn't have anything in my hand or he didn't see me moving, working, [Geraldi] had a problem with that." Plaintiff testified that Saturday was the same way and it got worse on Sunday. Plaintiff said to himself at that point that the next time Geraldi bothered him, he was going to report him or "just let him know to leave me alone."

On September 16, 2014, Geraldi hollered down a hallway toward plaintiff, "Are you ready for a lockdown?" Prior to this, there had been some joking between Geraldi and plaintiff about Geraldi being like a prison warden. When plaintiff replied, "What did you say?" Geraldi repeated his question. For plaintiff this was "the last straw." Plaintiff responded by letting go of his cleaning tools and rushing down the hallway toward Geraldi until he was only about an inch from Geraldi's face. Plaintiff was quite angry and was shouting. He told Geraldi "I'm tired of your stuff" and "I don't like your style." He had his hand up, pointing or otherwise gesturing at Geraldi, although

3

plaintiff did not make physical contact. Plaintiff concedes he "may have been moving his hands" but denies that he gestured in a threatening way.

Supervisor Dwight Hawkins witnessed the incident and pulled the two men into his office. Hawkins asked what was going on, and plaintiff said Geraldi needed to "stay off his back." Geraldi made a comment about plaintiff leaving the room or the building "with a toe tag," which plaintiff interpreted as a threat. Hawkins told the men to calm down and sent them back to work.

When plaintiff arrived the next day, Human Resources interviewed him. After the interview, he was suspended pending an investigation. Geraldi was also interviewed. Geraldi told Human Resources that during the altercation, plaintiff said he had "punched out people before and will punch him out." Human Resources also interviewed Hawkins, who reported that plaintiff said he had "punched out CEOs before and didn't have a problem with hitting [Geraldi]." Plaintiff denies he made such a statement to Geraldi.

SLS's Rules of Conduct set out examples of behaviors that may result in immediate discipline up to and including discharge. The examples include: fighting, causing a fight, or striking anyone on Health System property; use of profane, threatening, or abusive language towards others; scuffling, throwing objects, or horseplay of any description; and failure to cooperate or display courtesy to other employees.

Tonya Robinson of Human Resources conducted an investigation. HR prepared a disciplinary report on September 22, 2014, that recommended plaintiff's termination

for inappropriate behavior and failure to adhere to policies. The report asserted that plaintiff engaged in inappropriate behavior ("threatening acts at an employee" and "using verbal attacks"), that his behavior was inexcusable and a major violation of company policy, and that plaintiff "had a history of this type of behavior and has received discipline for it." John McReynolds and Director of Human Resources Donna Kunz reviewed the report and made the decision to terminate plaintiff's employment. Geraldi was not consulted about the decision. Hawkins would have been consulted and had input because of his managerial role. In reaching their decision, McReynolds and Kunz considered plaintiff's prior discipline for aggressive behavior. Plaintiff had been suspended in April 10, 2013, for an incident in which he became angry in a break room, slammed his hands down on a table, and used profanity. Plaintiff's supervisor at the time was Dennis Collins. Plaintiff had no problem with Collins and attributes no racial animus or comments to him.

McReynolds was aware when he terminated plaintiff that another employee said Geraldi was not easy to work with, that he was critical, and that he was not a team player. He was also aware from the incident report that plaintiff complained about Geraldi's treatment of him.

Emails show that on September 24, 2014, Tonya Robinson pointed out to McReynolds that according to Dwight Hawkins, Geraldi told plaintiff during the altercation that "if anyone will leave out of here it will be you with a toe tag." McReynolds asked Hawkins to document the comment. On September 29, 2014, HR prepared a disciplinary report recommending Geraldi's termination for inappropriate

5

conduct and violation of the Rules of Conduct. The report noted Geraldi's "toe tag" comment and said Geraldi had been counseled several times before on how to speak to staff. It said "this type of conduct is inexcusable for any employee let alone one in a leadership role" and that "using verbal attacks" was grounds for dismissal. McReynolds approved Geraldi's termination on October 3, 2014.

At his deposition, plaintiff was asked whether he agreed that his behavior that day was a major violation of the company's behavior policy. Plaintiff responded, "Yeah, it was pretty bad. Yes, I agree." In a declaration, plaintiff clarifies that the incident became "'pretty bad' only after [Geraldi] threatened to kill me."

**II. Summary Judgment Standards.**

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Haynes v. Level 3 Communs.*, 456 F.3d 1215, 1219 (10th Cir. 2006). The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol–Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986)). The nonmovant must then bring forth specific facts showing a genuine issue for trial. *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

### III. Discussion.

Plaintiff contends he was discharged on account of his race. Under Title VII, it is unlawful "to discharge any individual, or otherwise discriminate against any individual with respect to his … conditions of employment, because of such individual's … race." 42 U.S.C. § 2000e-2(a)(1). In the absence of direct evidence of discriminatory intent, a Title VII violation can be proved with circumstantial evidence. A plaintiff may prove discriminatory intent by showing that "the challenged action took place under circumstances giving rise to an inference of discrimination." *E.E.O.C. v. PVNF, L.L.C.,* 487 F.3d 790, 800 (10th Cir. 2007). In analyzing such claims, the court uses the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Under *McDonnell Douglas,* the plaintiff must first establish a prima facie case of discrimination. If plaintiff does so, the employer must then identify legitimate, nondiscriminatory reasons for its action. Finally, if the employer meets that burden, the plaintiff must then establish that the employer's articulated reason was a pretext to mask unlawful discrimination. *McDonnell*, 411 U.S. at 802–04.

SLS contends it is entitled to summary judgment because plaintiff fails to establish a prima facie case of discrimination and because SLS's stated reason for the termination was non-discriminatory and plaintiff cites no evidence that it was a pretext for discrimination. Because the court agrees with the latter argument, it need not address the former one.

A plaintiff demonstrates pretext by producing evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

7

proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Jaramillo v. Colo. Judicial Dept.*, 427 F.3d 1303, 1307 (10th Cir. 2005).

Plaintiff contends evidence of pretext exists because of the following. First, he was fired on September 22, 2014, six days after the incident, but Geraldi was not fired until over two weeks after the incident. Second, SLS allegedly failed to get a statement from Gino Carillo, who according to plaintiff was "the only non-management witness to the incident." And third, plaintiff argues that the factual reasons for the termination cited by McReynolds in his deposition have been contravened by plaintiff and are unworthy of belief. Dkt. 39 at 17-18.

The discrepancy between the termination dates of plaintiff and Geraldi cannot support an inference of pretext. The record shows that Human Resources recommended plaintiff's termination on September 22 and Geraldi's termination on September 29. Emails show that in between those two dates, McReynolds corresponded with HR about the investigation and requested that Hawkins document Geraldi's "toe tag" comment. McReynolds subsequently approved Geraldi's termination within a few days of HR's report and recommendation. This difference in termination dates, standing alone, is trivial and cannot reasonably support an inference that SLS did not really terminate plaintiff based upon his conduct in the September 16 incident.

SLS's alleged failure to obtain a statement from eyewitness Gino Carillo likewise cannot support a finding of pretext. Plaintiff cites no evidence that Carillo would offer a

8

materially different version of the incident or that it could affect SLS's conclusion that plaintiff violated its rules and should be terminated. In fact, plaintiff's conduct during the incident is (with one or two exceptions) basically uncontroverted and is consistent with SLS's stated reason for terminating him. Plaintiff makes no showing that the failure to obtain a statement from Carillo made any possible difference in the outcome or undermines the credence of SLS's justification for the termination.

Finally, plaintiff attempts to show that some of McReynold's deposition answers support an inference of pretext. He first asserts that McReynolds falsely stated plaintiff "threw" his mops at the outset of the confrontation with Geraldi. Plaintiff was asked in his deposition whether he threw his mops and broom down and responded: "I do believe I had something in my hand. I think – maybe I – I tried to put it up against the wall. I don't know what it was. But yeah, I had something in my hand, and I let it go." Dkt. 34-1 at 21. This minor difference in characterization – throwing a mop down versus letting it go - does not give rise to an inference of pretext. Next, plaintiff singles out McReynolds' statement that plaintiff "ran after" Geraldi. *See* Dkt. 39-2 at 13 (McReynolds stating in deposition testimony that plaintiff "in the hallway, ran after [Geraldi], and he's tired of putting up with this stuff, and the way that it was described to me, that it was an aggressive behavior toward [Geraldi]"). Plaintiff's deposition testimony was that he didn't say anything in response to Geraldi's question, he "just rushed – rushed – I didn't run. I was walking real fast, and it's like this (indicating), really, really close to him." Dkt. 34-1 at 16. Again, the difference between "walking real fast" and running towards Geraldi is a minor distinction that does not suggest pretext.

Plaintiff makes similar arguments with respect to McReynold's statements about "threatening gestures," "fighting," and using "profanity." Plaintiff's own testimony would support a conclusion that his gestures could have been perceived as threatening by Geraldi, even if that was not plaintiff's intention. *See* Dkt. 34-1 at 8 ("And we got into a little shouting match – shouting. I think he thought I was coming down there to hit him, but I was really, really close to him, and I was letting him know how I felt about it And I was angry about it.") and at 16 ("And I think - I never – my intention was not to hit him. Maybe I had my hand up maybe pointing but not in his face. I was just moving my hands around. So I guess that's where [Hawkins] maybe assumed that I was going to do some physical harm to him."). As for "fighting," McReynolds clarified in his deposition that he was not claiming plaintiff had engaged in or caused any physical striking, but said he had engaged in "aggressive behavior that … could lead to a fight." McReynolds also clarified, after initially stating erroneously that plaintiff's improper conduct involved "aggressive behavior and profanity," that there was no report of plaintiff using profanity but that "his aggressive behavior" justified the termination. Dkt. 39-2 at 13.

None of these contentions, alone or in combination, are sufficient to raise a genuine issue of pretext. Moreover, in determining whether a proffered reason was pretextual, the court "examine[s] the facts as they appear to the *person making the decision*" and does not "look to the plaintiff's subjective evaluation of the situation." *Depaula v. Easter Seals El Mirador*, 859 F.3d 957, 971 (10th Cir. 2017) (quoting *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, (10th Cir. 2011) (emphasis in *Depaula*). The relevant

10

inquiry "concerns the belief of the employer that the employee engaged in misconduct, not whether the actual facts, as shown by evidence extrinsic to the employer's assessment, may have been otherwise." *Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1178 (10th Cir. 2005). Plaintiff cites no evidence to reasonably suggest that McReynolds and Kunz did not in good faith believe plaintiff had engaged in inappropriately aggressive conduct in the dispute with Geraldi. As such, he has failed to show a genuine issue of fact as to whether SLS's justification for his termination was a pretext for discrimination.

**IT IS THEREFORE ORDERED** this 30th day of August, 2017, that defendant's motion for summary judgment (Dkt. 33) is GRANTED. Plaintiff's action is hereby dismissed on the merits, with plaintiff to take nothing on the claim.

    ___s/ J. Thomas Marten_____
    J. THOMAS MARTEN, JUDGE